2007 WY 139

**Douglas Peter SZYMANSKI,**
**Appellant (Defendant),**

v.

**The STATE of Wyoming,**
**Appellee (Plaintiff).**

No. 06–106.

Supreme Court of Wyoming.

Aug. 29, 2007.

Representing Appellant: D. Terry Rogers, Interim State Public Defender, PDP; Donna D. Domonkos, Appellate Counsel; Tina N. Kerin, Senior Assistant Public Defender. Argument by Ms. Kerin.

Representing Appellee: Patrick J. Crank, Attorney General; Terry L. Armitage, Deputy Attorney General; D. Michael Pauling, Senior Assistant Attorney General; Daniel M. Fetsco, Senior Assistant Attorney General. Argument by Mr. Armitage.

Before VOIGT, C.J., and GOLDEN, HILL, KITE, and BURKE, JJ.

KITE, Justice.

[¶ 1] A jury convicted Douglas Peter Szymanski of one count of first degree arson for intentionally setting fire to his neighbor's apartment. Mr. Szymanski appeals his conviction claiming the trial court erred in allowing the State's fire expert to testify concerning hearsay statements made to him by a deceased witness during his investigation of the fire's cause. He also claims the prosecutor committed misconduct during witness questioning and closing argument. We affirm.

## ISSUES

[¶ 2] Mr. Szymanski presents the issues as follows:

I. Was hearsay testimony of a deceased witness improperly admitted, and then argued for the truth of the matter asserted?

II. Did prosecutorial misconduct occur in questioning of witnesses and in closing argument?

The State reframes the issues as:

I. Did the district court abuse its discretion when it admitted the pretrial statements of the victim?

II. Did the prosecution commit misconduct?

## FACTS

[¶ 3] At approximately 8:30 p.m. on April 1, 2005, Tammy Johnson, a tenant in an apartment complex owned by the Casper Housing Authority located at 243 East K Street in Casper, Wyoming, was returning home. As she approached her apartment, she noticed Mr. Szymanski, who also lived in the apartment complex and with whom she had an "on again-off again" relationship, coming toward her. He was acting strangely and was wearing the type of latex gloves worn by volunteer firefighters.

[¶ 4] As Mr. Szymanski approached Ms. Johnson, he said, "Guess what? Electricity is out. Ha ha ha." She asked what was going on and he did not respond. Ms. Johnson entered her apartment, walked toward the kitchen window and saw that the apartment next to hers, in which Sharon Jones lived, was on fire. Ms. Johnson attempted to call 911 but discovered her phone was not working. She ran to the apartment of another tenant who called 911.

[¶ 5] Worried about the fire reaching her own apartment, Ms. Johnson went back to try to retrieve some of her possessions. Mr. Szymanski followed her into her apartment. He told her she needed to get out and grabbed her arm. He became angry and hit her with the gloves he had been wearing. He said, "I'm just going to burn you. You're going to die, you f——ing, ——." He left and she heard a rapping noise on her bedroom

window. She heard Mr. Szymanski outside the window saying, "Bitch, come on, bitch, you're going to die."

[¶ 6] At approximately 8:40 p.m., the Casper Public Safety Communications Center / 911 received the report of the fire. Police officers and firefighters responded. When they arrived at the scene, they determined that the fire was located in unit 241 of the apartment complex. They observed Mr. Szymanski outside the burning apartment. He appeared anxious to enter the apartment and had to be asked twice to move out of the way. One of the firefighters noticed Mr. Szymanski had a hammer sticking out of the back of his pants.

[¶ 7] As firefighters worked to extinguish the fire, Ms. Johnson reported Mr. Szymanski's behavior to police at the scene. When the police spoke with him, he appeared to be intoxicated. They asked him to return to his apartment and he refused, becoming increasingly belligerent and uncooperative. Consequently, police arrested him for public intoxication. A struggle ensued and the officers had to use physical force in order to handcuff him and get him into the patrol car.

[¶ 8] At the detention center, one of the officers removed a hammer from the back of Mr. Szymanski's pants and a jar of onion powder from the front of his pants. Mr. Szymanski had soot marks on his face and his clothes smelled of smoke. Small shards of glass were found on the hammer and Mr. Szymanski's clothes and shoes.

[¶ 9] Fire Inspector Mike Magee and Police Detective Brian Street were called to investigate the cause and origin of the fire. They found a disposable lighter in the parking lot of the apartment complex next to Mr. Szymanski's car which Ms. Johnson identified as one she had seen him use to light his cigarettes. They also found a steak knife inside the doorjamb of the burned apartment which witnesses identified as identical to knives found in Mr. Szymanski's apartment. They concluded someone had broken the electrical meter outside the apartment, forcibly entered and ransacked Ms. Jones' apartment, leaving piles of clothing, bags, spice containers, food boxes and other combustible items strewn about on the floor and breaking

several windows and a bathroom mirror, and then intentionally set fire to the piles of debris dumped in the kitchen.

[¶ 10] Mr. Szymanski was charged with first degree arson in violation of Wyo. Stat. Ann. § 6–3–101(a) and (b) (LexisNexis 2007). After a six day trial, the jury found him guilty. The district court sentenced him to 16 to 20 years in the Wyoming State Penitentiary.

## DISCUSSION

### 1. Hearsay Testimony of Deceased Witness

[¶ 11] Prior to trial, Ms. Jones, the tenant of the apartment in which the fire was set, died of causes unrelated to the fire. During trial, the prosecution sought to present testimony from Inspector Magee concerning his interview of Ms. Jones on the night of the fire. The purpose of the interview was to determine the condition of her apartment prior to the fire. Ms. Jones' statements were important to the investigation because of the unusual amount of combustible material found piled on the floor throughout her apartment. During the interview, Ms. Jones told Inspector Magee that her apartment was clean and orderly and locked and secure when she left it before the fire. She also told him the bathroom mirror "should not have been broken."

[¶ 12] Defense counsel objected to the testimony on the grounds that it constituted hearsay and violated Mr. Szymanski's constitutional right to confront the witness against him, Ms. Jones. The district court allowed the testimony, concluding it fell within an exception to the hearsay rule, was not testimonial and did not violate the confrontation clause. After the State presented the disputed testimony, defense counsel requested and the district court gave an instruction telling the jury the testimony was not admitted for the truth of the matters asserted (i.e. to prove Ms. Jones' apartment was clean when she left it) but only for the purpose of showing what Inspector Magee did in the course of investigating the fire.

[¶ 13] Mr. Szymanski claims the trial court erred in allowing Inspector Magee to testify concerning Ms. Jones' statements because admission of the testimony violated his right to confront the witnesses against him guaranteed by the Sixth Amendment. Mr. Szymanski relies primarily on *Crawford v. Washington*, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) to support his claim.

[¶ 14] The State responds that the trial court did not abuse its discretion by allowing the testimony. It argues the trial court correctly distinguished the statements at issue here from those in *Crawford*, which involved statements of the defendant's wife implicating him in the charged offense. The State further asserts, even if the trial court incorrectly admitted the statements, the error was harmless because Ms. Jones did not identify Mr. Szymanski as the arsonist.

[¶ 15] We review claimed error concerning the improper admission of evidence for abuse of discretion and will not reverse the trial court's decision absent a clear abuse. *Bromley v. State*, 2007 WY 20, ¶ 8, 150 P.3d 1202, 1206–07 (Wyo.2007). A trial court abuses its discretion when it could not have reasonably concluded as it did. *Id.* In this context, "reasonably" means sound judgment exercised with regard to what is right under the circumstances and without being arbitrary or capricious. *Id.* Because the claimed error involves a mixed question of fact and constitutional law, we independently review the record. *Vigil v. State*, 2004 WY 110, ¶ 17, 98 P.3d 172, 177 (Wyo. 2004).

[¶ 16] The Sixth Amendment protects the right of the accused to confront the witnesses against him. In *Crawford*, the United States Supreme Court held that this provision bars the admission of testimonial statements made by a witness who does not appear at trial unless he or she is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. The Court identified various types of statements qualifying as "testimonial," including affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine or similar pretrial statements that a witness would reasonably expect to be used at a later trial.

*Crawford*, 541 U.S. at 51–52, 124 S.Ct. 1354. The Court specifically mentioned police interrogations, using the term in its colloquial rather than technical sense, and said such interrogations are testimonial even under a narrow standard. The Court concluded the statements at issue in *Crawford*, i.e. tape-recorded statements of the defendant's wife made by police during an interrogation on the night of the offense, qualified as testimonial "under any conceivable definition" because they were "knowingly given in response to structured police questioning." *Id.* at 53, 124 S.Ct. 1354. The court held that admission of the statements, when the wife was not available to testify at trial and the defense had no prior opportunity to cross-examine her, violated the defendant's confrontation rights.

[¶ 17] Following *Crawford*, this Court held in *Vigil*, ¶ 16, 98 P.3d at 177, that a police officer's testimony concerning statements made to him by a witness who was unavailable to testify at trial and whom the defense had not had an opportunity to cross-examine violated the Confrontation Clause. In *Vigil*, two men, Mr. Vigil and Mr. Newton, were involved in an assault that led to the filing of charges against each of them. As part of a plea agreement, Mr. Newton pled guilty and was sentenced. *Id.*, ¶ 9, 98 P.3d at 176. Subsequently, he was called to testify in Mr. Vigil's trial and, after answering a few preliminary questions, invoked his Fifth Amendment right against self-incrimination. *Id.* As a consequence, the trial court declared Mr. Newton unavailable as a witness. The State then called the officer who interviewed Mr. Newton after his arrest to testify concerning statements Mr. Newton made about Mr. Vigil's involvement in the crime. Concluding the statements were testimonial, we held that their admission violated Mr. Vigil's Sixth Amendment right to confront the witnesses against him. *Id.*, ¶ 19, 98 P.3d at 179. We further held the admission was not harmless because we could not say beyond a reasonable doubt that the testimony did not contribute to the jury's verdict. *Id.*, ¶ 21, 98 P.3d at 180.

[¶ 18] Subsequently, in *Davis v. Washington*, — U.S. —, 126 S.Ct. 2266, 165

L.Ed.2d 224 (2006), the United States Supreme Court revisited *Crawford* and the Sixth Amendment right of confrontation in the context of two cases, *Davis* and *Hammon.* For purposes of deciding those cases, the Court went beyond what it said in *Crawford* and further defined the term "testimonial statements" as follows:

[S]tatements are nontestimonial when made in the course of police interrogation under circumstances objectively indicating that the primary purpose of the interrogation is to enable police assistance to meet an ongoing emergency. They are testimonial when the circumstances objectively indicate that there is no such ongoing emergency, and that the primary purpose of the interrogation is to establish or prove past events potentially relevant to later criminal prosecution.

*Id.* at 2273–74. Applying this definition, the Court held in *Davis* that the admission of a domestic disturbance victim's recorded statements during her call to a 911 emergency operator did not violate the confrontation clause. The Court said:

[the victim] was speaking about events as they were actually happening, rather than describing past events. * * * [She] was facing an ongoing emergency. * * * [Her] call was plainly a call for help against a bona fide physical threat. * * * [Her] frantic answers were provided over the phone, in an environment that was not tranquil, or even * * * safe.

We conclude from all this that the circumstances of [the victim's] interrogation objectively indicate its primary purpose was to enable police assistance to meet an ongoing emergency.

*Id.* at 2276–77.

[¶ 19] In contrast, the Court held that the admission in *Hammon* of a victim's statements to police officers who responded to a domestic disturbance call did violate the confrontation clause where:

[T]he interrogation was part of an investigation into possibly criminal past conduct. . . . There was no emergency in progress; the interrogating officer testified that he had heard no arguments or crashing and saw no one throw or break any-

thing. When the officers first arrived, [the victim] told them that things were fine and there was no immediate threat to her person. When the officer questioned [the victim] for the second time, and elicited the challenged statements, he was not seeking to determine (as in *Davis* ) "what is happening," but rather "what happened." Objectively viewed, the primary, if not the sole, purpose of the interrogation was to investigate a possible crime. . . .

*Davis,* 126 S.Ct. at 2278.

[¶ 20] Applying these standards would seem to compel the conclusion that the statements Mr. Szymanski challenges were testimonial and violated his right to confrontation because Ms. Jones was unavailable at trial and he did not have a prior opportunity to cross-examine her. Unlike the statements in *Davis,* Ms. Jones was not speaking about events as they were actually happening, but was describing past events. She was not facing an emergency and had not called for help. The interview was part of Inspector Magee's investigation into the cause of the fire that had already been extinguished by firefighters. He was not seeking to determine what was happening but rather what had happened. From all of the circumstances, it is clear the primary purpose of the interview was not to enable police assistance to meet an ongoing emergency. Rather, the purpose was to investigate a possible crime.

[¶ 21] Despite the result *Crawford* and *Davis* seem to dictate, the district court admitted the statements. It did so based upon *Allen v. State,* 2002 WY 48, 43 P.3d 551 (Wyo.2002), an aggravated vehicular homicide case in which the Court upheld the admission of a police officer's expert opinion testimony, including his testimony concerning eyewitness statements he reviewed in the course of investigating the accident. In finding the testimony admissible, the *Allen* Court relied on W.R.E. 703, which provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made know to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming

opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

Citing the rule, the Court concluded in *Allen* that the district court did not abuse its discretion in allowing the police officer to testify concerning the eyewitness statements. The Court said: "The statements clearly formed the basis for, and were relevant to, [the officer's] opinion * * * regarding the complete picture or precisely how the collision occurred." *Allen*, ¶ 71, 43 P.3d at 574–75.

[¶ 22] In this case, the district court relied on *Allen* in ruling that Inspector Magee's testimony concerning the statements Ms. Jones made to him during his investigation would be admitted to show the basis for his opinion under W.R.E. 703. To ensure the non-hearsay purpose [1] for which it admitted the testimony, the district court instructed the jury immediately after Inspector Magee testified about Ms. Jones' statements that the testimony was not being allowed for the truth of the matter asserted but only to show what the inspector did and what information he relied upon in forming the opinion that the fire was intentionally set by human hand.

[¶ 23] Christopher B. Mueller & Laird C. Kirkpatrick, *Federal Evidence* § 8.27, 212–13 (3d ed.2007) contains a helpful discussion of the interplay between the confrontation clause and F.R.E. 703. Among the categories of statements the authors list as admissible under *Crawford* are those having non-hearsay uses. *Id.*

> *Crawford* does not block the nonhearsay use of statements offered against the accused * * * * Thus, statements may be admitted to provide context for other statements without offending the *Crawford* doctrine. The same applies to statements offered as background to explain the acts of law enforcement officers during investigations, which are often admitted as nonhearsay—analytically, as showing what information the officers had. These, too, do not violate *Crawford*.

*Id.*

[¶ 24] *Edwards v. State*, 200 S.W.3d 500 (Mo. banc 2006) illustrates this point. Mr.

Edwards was charged with first degree murder in the shooting death of his former wife. The evidence presented at trial showed that he agreed to pay another man, Mr. Wilson, to kill her. Mr. Wilson was also charged with and convicted of first degree murder for her death and was not available at trial. The trial court allowed police officers to testify concerning their investigation, including an interview of Mr. Wilson in which he told them where he hid the murder weapon.

[¶ 25] On direct appeal before *Crawford* and *Davis* were decided, the Missouri Supreme Court held the trial court correctly ruled that testimony about Mr. Wilson's statements to the police could not be admitted for its truth, but was admissible for the limited purpose of explaining the officers' subsequent investigation. *State v. Edwards*, 116 S.W.3d 511, 532–22 (Mo.2003). The Court noted that the trial court had carefully restricted testimony concerning Mr. Wilson's statements so that the jury did not hear improper statements implicating Mr. Edwards. *Id.* at 533. In his post-conviction appeal, decided after *Crawford* and *Davis*, the Court affirmed its prior ruling, stating:

> The record shows, as this Court concluded on direct appeal, that all of the evidence was admitted for the limited-and proper—purpose of explaining subsequent police actions. The judge carefully controlled the evidence so that no witnesses were allowed to testify improperly about what Wilson had told them. Because none of Wilson's statements implicating Edwards was admitted for its truth, there was no testimonial evidence involved, and the Confrontation Clause was not implicated. Because the Confrontation Clause was not implicated, the subsequent decisions of *Crawford* and *Davis* do not change the conclusion of this Court on direct appeal that no improper hearsay was admitted.

*Edwards*, 200 S.W.3d at 512.

[¶ 26] We find the court's reasoning in *Edwards* persuasive. As in that case, In-

---

1. The district court characterized the testimony as falling within an exception to the hearsay rule. More accurately, the testimony was non-hearsay because it was not offered for the truth of the matter asserted.

spector Magee's testimony concerning Ms. Jones' statements was admitted not to establish the truth of the statements but for the limited purpose of describing his investigation. The statements did not identify or even implicate Mr. Szymanski as the arsonist. Because the statements were not admitted for their truth, and did not implicate Mr. Szymanski, their admission did not violate the confrontation clause. We hold the district court did not abuse its discretion in admitting the testimony.[2]

### 2. Prosecutorial Misconduct

[¶ 27] Mr. Szymanski claims the prosecutor committed misconduct in several instances during witness questioning and closing argument. The State responds that no prosecutorial misconduct occurred. We review allegations of prosecutorial misconduct by reference to the entire record to determine whether a defendant's case has been so prejudiced as to deny him a fair trial. *Talley v. State*, 2007 WY 37, ¶ 9, 153 P.3d 256, 260 (Wyo.2007). The propriety of any comment made during closing argument is measured in the context of the entire argument. *Id.* Reversal is not warranted unless a reasonable probability exists that absent the error the appellant may have enjoyed a more favorable verdict. *Id.*

[¶ 28] Mr. Szymanski has the burden of demonstrating plain error because defense counsel did not object at trial to either the prosecutor's questioning or to the closing argument. Plain error exists when: 1) the record is clear about the incident alleged as error; 2) there was a transgression of a clear and unequivocal rule of law; and 3) the party claiming the error was denied a substantial right which materially prejudiced him. *Id.* Mr. Szymanski claims prosecutorial misconduct occurred in five instances, which we address individually.

#### a. Improper Comment on Witness Credibility

[¶ 29] Mr. Szymanski's first claim of prosecutorial misconduct arises from the prosecutor's questioning of Inspector Magee on re-direct examination concerning an interview of Mr. Szymanski which defense counsel asked about during cross-examination. In response to the prosecutor's questions, Inspector Magee testified that he did not find Mr. Szymanski's statements during the interview to be sufficiently reliable to include them in his conclusions. Mr. Szymanski claims this testimony and the prosecutor's use of it during closing argument amounted to prosecutorial misconduct because they constituted improper comments on his credibility.

[¶ 30] The credibility of witnesses and the guilt of the accused are questions for the jury to resolve. *Sanchez v. State*, 2006 WY 116, ¶ 47, 142 P.3d 1134, 1146 (Wyo.2006). No witness should be permitted to testify that another witness is or is not telling the truth. *Id.* However, testimony that assists the jury in understanding some aspect of the testimony of another witness that does not comment directly on that witness' credibility or veracity, does not invade the role of the jury. *Id.*, ¶ 48, 142 P.3d at 1146. Although such testimony may have the collateral or incidental effect of supporting or undermining a witness' credibility, it is not a direct comment on his credibility or veracity and cannot be said to constitute error. *Id.*

[¶ 31] Moreover, when the defendant initiates a line of questioning, the prosecutor is entitled to follow up with further questioning as long as such questioning is not excessive. *Cazier v. State*, 2006 WY 153, ¶ 21, 148 P.3d 23, 34 (Wyo.2006). Defense counsel cross-examined Inspector Magee in relevant part as follows:

Q. Investigator Magee, you would agree with me that the final opinion that a

---

2. In reaching this result, we are cognizant of the concern that "overuse and misuse of source material ... [by expert witnesses] raises confrontation concerns, and both the expert testimony provisions and the confrontation clause reinforce the message that experts are not to be used as conduits in criminal cases for out-of-court statements that incriminate defendants." Mueller & Kirkpatrick, *supra*, at 215. However, it is central to our holding in this case that the out-of-court statement did not incriminate Mr. Szymanski.

fire investigator reaches in a case is only as good or accurate as the quality and completeness of the data that he considers in formulating his opinion, would you agree with that?

A. Not all the data needs to be collected to formulate an opinion.

Q. I understand that. But if you don't— if you have incomplete data, it's less likely that you'll have an accurate conclusion; is that right?

A. There's a possibility of that.

Q. And, in fact, the more incomplete your data is, the more likelihood there is that your conclusion might not be accurate?

A. That is a possibility.

\* \* \*

Q. You would agree with me that witness interviews are an important way for a fire investigator to collect information about the cause and origin of a fire?

A. Collectively, it's very important, yes.

Q. And you rely upon and consider all of the data that you collect through witness interviews?

A. Yes, sir.

Q. In this case, you took [part] in an interview of Mr. Szymanski, didn't you?

A. I took part in it, yes.

[¶ 32] The State objected to further questioning about the interview as going beyond the scope of direct examination and calling for inadmissible hearsay. The district court allowed defense counsel to inquire about the interview to the extent that it related to information Inspector Magee collected in investigating the fire's cause and Mr. Szymanski's comments about who might have started it. Thereafter, defense counsel elicited testimony from Inspector Magee to the effect that Mr. Szymanski said during the interview that he thought maybe a man who came to the apartment looking for Ms. Jones a day or two before started the fire. Inspector Magee testified that Mr. Szymanski also said that the man told him to tell Ms. Jones that "I want my money."

[¶ 33] On re-direct, the prosecutor proceeded as follows:

Q. Now, you were asked about an interview where you were present with Mr. Szymanski and you were also asked about motives, is that correct, by [defense counsel]?

A. Yes.

Q. And you stated earlier that some interviews you consider sufficiently reliable to include in your process; is that true?

A. That's true.

Q. Did you find Mr. Szymanski's information crediting statements to some other person reliable enough to include in your conclusions?

A. No.

During closing argument, the prosecutor made the statement that no credible evidence of other suspects was presented.

[¶ 34] It is apparent from the course of the testimony that the challenged testimony arose when the prosecutor attempted to rehabilitate Inspector Magee after defense counsel questioned him concerning the importance of interviews generally and Mr. Szymanski's interview specifically. Once the defense opened that door, the prosecutor was entitled to make reasonable inquiry concerning why the witness did not include the interview in his conclusions. Under the circumstances, we conclude the prosecutor's questions were permissible and not excessive. The State simply responded to defense counsel's efforts to cast doubt on the thoroughness of the inspector's investigation. Neither the testimony nor the comment in closing argument directly commented on Mr. Szymanski's credibility but instead assisted the jury in understanding the information Inspector Magee relied upon in determining the cause of the fire. Accordingly, we reject Mr. Szymanski's claim that prosecutorial misconduct resulted from presentation of the testimony and argument.

**b. *Improper Character Evidence***

[¶ 35] Mr. Szymanski argues next that plain error occurred because the State presented improper character evidence

against him. He cites the following testimony elicited by the prosecutor on re-direct examination of Inspector Magee:

Q. In fact, when we talk about motives, is blame shifting by suspects unusual?

A. That's not unusual at all.

Q. In fact, it's quite common?

A. Yes, it is.

Q. And you were asked about covering up crimes as a motive?

A. Yes.

Q. You're trained in other motives as well; is that true?

A. That's right.

Q. First, crimes could also include vandalism?

A. Yes, sir.

Q. Crimes could include theft?

A. Yes.

Q. In addition, is there another motive called attention seeking?

A. Yes, there is.

Q. Is this also referred to as the hero fire setter?

A. The hero fire setter.

Q. What's the goal of a hero fire setter according to your training?

A. The goal of a hero fire setter is to seek as much attention as they can by committing an arson and then getting credit for either discovering it or extinguishing the fire or rescuing someone.

Q. And they get attention from people they want attention from?

A. That's right.

Q. In addition to that, is there revenge, spite fire sets?

A. Yes, there is.

Q. What is a revenge spite fire set?

A. That is common here in Casper, and that is an arson where someone gets back at someone, usually involves boyfriend/girlfriend, husband/wife, significant other. And the way they get back at them is they intentionally burn their property.

[¶ 36] W.R.E. 404 provides in relevant part:

(a) *Character evidence generally.*—Evidence of a person's character or a trait of his character is not admissible for the purpose of proving that he acted in conformity therewith on a particular occasion.

Mr. Szymanski argues that admission of Inspector Magee's testimony concerning the common motives of arsonists was plain error because the State presented the testimony to prove he was an arsonist who acted in conformity with those motives on the night of the fire.

[¶ 37] In support of his claim, he cites *Skinner v. State*, 2001 WY 102, 33 P.3d 758 (Wyo.2001), in which this Court held that testimony concerning the general characteristics and conduct of batterers was inadmissible to show the defendant acted in conformity with those characteristics. We said:

Although battered-woman-syndrome testimony is admissible and helpful to the jury, it must not run afoul of W.R.E. 404(a).... When battered-woman-syndrome testimony is raised by the state in its case-in-chief and relates to a defendant, as it did in the instant case, the "testimony 'draws close to commenting directly on what likely happened' and 'looks like character evidence after all.'" *Ryan*, 988 P.2d at 55 (quoting Christopher B. Mueller & Laird C. Kirkpatrick, 3 Federal Evidence § 637 (2d ed.1994)). Evidence concerning a defendant's involvement demands close scrutiny under the character evidence rules. *Id.* "This is so even if reference to the defendant may only be inferred from the testimony." *Id.*

*Skinner*, ¶ 27, 33 P.3d at 767.

[¶ 38] Arguably, the expert testimony concerning the patterns of arsonists is "profile testimony" in the same sense as the challenged testimony in *Skinner*. We need not decide that issue, however, because unlike the situation in *Skinner* where the challenged testimony was raised by the state in its case-in-chief, in the present case the defense opened the door to the testimony on cross-examination. During defense counsel's cross-examination of Inspector Magee, the following exchange occurred:

Q. Now, in your training as a fire investigator, did you learn various reasons—different categories of reasons why people might start fires?

A. Yes.

Q. Okay. One of the well-known reasons for an arson fire is to cover up a burglary; isn't that right?

A. Yes, it is.

Q. Can you explain that for us?

A. What the perpetrator attempts to do is to take the attention off of one crime by—by arson, by putting the attention onto the arson rather than the crime. It occurs with not only burglary but with a host of crimes, murder.

[¶ 39] With this cross-examination, defense counsel opened the door to questions by the State on re-direct concerning other reasons that people set fires. Once the defense opened that door, the prosecutor was entitled to make reasonable inquiry concerning other motives for arson. We do not find the prosecutor's questions in that regard to be excessive. Accordingly, we reject Mr. Szymanski's claim that prosecutorial misconduct resulted from presentation of this testimony.

[¶ 40] In closing argument, the prosecutor made the following comments concerning the motive evidence:

When we look at motive, remember Mr. Magee's testimony. He was asked this actually by [defense counsel], Well, can't that be to cover up a crime? Sure. But there's nothing taken for a burglary. It might be to cover up vandalism. But more importantly, he talked about a couple of other motivations seen in arson cases. One is a spite/revenge. That is I'm mad at somebody, I get revenge upon them by burning their property. The second is the attention getting fire setter, the one that wants to be a hero. And these motives, of course, can exist at the same time. They don't have to be separate.

Isn't it interesting Tammy Johnson comes home, and the first thing Mr. Szymanski, the man that's been upset for weeks, according to Mr. Copple, that she isn't treating him right, isn't paying attention, and he concentrates on her. And she said playing the hero is what he was trying to do.

Given that defense counsel opened the door to Inspector Magee's testimony concerning motive, we likewise reject Mr. Szymanski's argument that these comments constituted prosecutorial misconduct.

### c. Violation of ABA Criminal Justice Standard for Courtroom Professionalism

[¶ 41] Mr. Szymanski claims next that prosecutorial misconduct occurred during the redirect examination of the State's forensic firearms and tool mark examiner, Mr. Dwight Van Horn. Mr. Van Horn was contacted by the Wyoming State Crime Lab and asked to provide an opinion as to whether marks appearing on the window and door frames of Ms. Jones' apartment matched the hammer taken from Mr. Szymanski on the night of the fire. On direct examination, he testified that the marks appeared to have been made by some type of striking instrument such as a hammer and the hammer found on Mr. Szymanski could have been the instrument. During cross-examination, defense counsel attempted to minimize the significance of Mr. Van Horn's opinion by showing that he could not identify the hammer taken from Mr. Szymanski as *the* striking instrument that made the marks and that the marks could have been made by one of numerous striking tools. Defense counsel also attempted to determine the parameters of Mr. Van Horn's expertise by asking questions about other fields related to tool mark analysis such as the examination of paint transfers. After the cross-examination of Mr. Van Horn, the prosecutor began his redirect examination as follows:

Q. Do you perform autopsies in your lab too?

A. No, sir.

Q. We've covered everything else. I thought I'd ask you about that.

Defense counsel objected to "the sarcastic comment" and asked that it be stricken. The district court sustained the objection and ordered the comment stricken. On appeal, Mr.

Szymanski claims the comment violated the American Bar Association Criminal Justice Standards, Prosecution Function 3–5.2, Courtroom Professionalism, subpart (a) which states:

> As an officer of the court, the prosecutor should support the authority of the court and the dignity of the trial courtroom by strict adherence to codes of professionalism and by manifesting a professional attitude toward the judge, opposing counsel, witnesses, defendants, jurors and others in the courtroom.

[¶ 42] Considering this standard in the context of a prosecutor's statement that defense counsel was counting on the jurors not following the law and knew the defendant's case was not meritorious, a Colorado court of appeals found no plain error. *People v. Darbe*, 62 P.3d 1006, 1013 (Colo.App. 2002). The court stated, "Unless a prosecutor's comment is flagrant, or glaringly or tremendously improper, it is not plain error." *Id.* Similarly, the court in *People v. Saiz*, 923 P.2d 197, 207 (Colo.App.1995), found no reversible error in a prosecutor's comments, including his clearly inappropriate statement comparing defense counsel to "an overwrought circus barker." Our review of the cases citing the Criminal Justice Standard as well as the record before us leads us to conclude that while the prosecutor's comment may have been unnecessary, it did not constitute plain error.

### d. Misstating the Evidence in Closing Argument

[¶ 43] Mr. Szymanski also claims prosecutorial misconduct occurred when the prosecutor misstated the evidence in closing argument by saying that another tenant in the apartment complex testified Mr. Szymanski had been upset "for weeks" because Ms. Johnson had not been treating him right or paying attention to him. Mr. Szymanski asserts the evidence was not that he had been upset for weeks but that he had complained frequently about Ms. Johnson's lack of attention. We conclude this distinction does not rise to the level of prosecutorial misconduct or plain error. The prosecutor's comment

was not an unreasonable inference from the evidence presented.

### e. Arguing Ms. Jones' Statements f or the Truth of the Matter Asserted

[¶ 44] Mr. Szymanski's final claim of prosecutorial misconduct is based on the following comment by the prosecutor in closing argument: "We know the condition of the apartment because Patrick Kernan was there the day before, and Sharon Jones had talked about the state of the apartment." He contends this constitutes prosecutorial misconduct because Ms. Jones' statements concerning the condition of her apartment were not admitted for their truth but for the limited purpose of describing Inspector Magee's investigation.

[¶ 45] We consider the challenged statement in the context of the entire closing argument and in the context of the entire trial. *Phillips v. State*, 2007 WY 25, ¶ 9, 151 P.3d 1131, 1134 (Wyo.2007). As we discussed in Mr. Szymanski's first issue, Ms. Jones' statements were admitted for the limited purpose of describing Inspector Magee's investigation. After his testimony, the jury was instructed the statements were not admitted for their truth. Therefore, it was improper for the prosecutor to suggest to the jury during closing argument that Ms. Jones' statements proved the condition of her apartment before the fire. However, in the context of the entire trial we do not find that Mr. Szymanski was prejudiced by the improper argument.

[¶ 46] As the prosecutor told the jury, Patrick Kernan, the director of operations for the Casper Housing Authority, also testified concerning the condition of the apartment, which he had inspected the day before the fire. He testified that he did not recall piles of clothes or other items on the floor of the apartment and that nothing obstructed his ability to walk around the apartment. He testified the apartment was not cluttered and there were no piles of debris in the kitchen when he inspected it the day before the fire. Given Mr. Kernan's testimony, there was evidence, other than Ms. Jones' statements, from which the prosecutor could properly argue the condition of the apartment prior to

the fire. In the context of the entire argument and the record, the fact that the prosecutor also mentioned Ms. Jones' statements as proving that the apartment was debris-free did not result in material prejudice.

## CONCLUSION

[¶ 47] Addressing Mr. Szymanski's claim that he was denied his right of confrontation, we conclude the statements Ms. Jones made during the investigative interview were not admitted for their truth, and did not implicate Mr. Szymanski. Therefore, their admission did not violate the confrontation clause and the district court did not abuse its discretion in admitting the testimony. With regard to Mr. Szymanski's claims of prosecutorial misconduct, we hold that no such misconduct occurred except that the State improperly argued Ms. Jones' statements for their truth contrary to the limited purpose for which they were admitted. However, the improper argument did not result in material prejudice because other evidence supported the State's argument.

[¶ 48] Mr. Szymanski's conviction is affirmed.